IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 10-CV-01998-RBJ

LARRY CARY, ELIZABETH CARY, MARK
CHAMBERLAIN, REBECCA CHAMBERLAIN,
and MARK and REBECCA CHAMBERLAIN as
next best friends of SAM CHAMBERLAIN and
BEN CHAMBERLAIN

      Plaintiffs,

v.

AUTOMOBILE INSURANCE COMPANY OF
HARTFORD, CONNECTICUT

      Defendants.

**ORDER on PENDING MOTIONS**

      This case, removed from the El Paso County District Court based upon diversity of citizenship per 28 U.S.C. § 1332, is set for a jury trial beginning January 9, 2012. This order resolves all pre-trial motions pending on this date.

**Facts**

      The defendant issued a homeowners' insurance policy for a residence owned by Mr. and Mrs. Cary. Mr. Cary's daughter, her husband, and their children, collectively the Chamberlains, resided in the home. In their Second Amended Complaint plaintiffs allege that before the Chamberlains moved into the home in 2004 defendant's representative told them that a new roof was needed. They hired a roofing company to replace the roof and decking. Upon discovering

that the residence did not have insulation above the ceiling, the roofing company installed insulation to comply with the local building code.

On or about December 1, 2006 the Chamberlains reported water damage to the defendant (Claim UNK1714). An adjustor, Christopher Cole, allegedly after an inadequate investigation, declared that the damage was weather related and advised the Chamberlains to paint over a large water stain. On or about January 24, 2008 the Chamberlains reported a small electrical fire in the kitchen to the defendant (Claim UND1788). Adjustor Cole, again allegedly without adequately investigating the claim, declared that the fire was caused by water running down the wall and entering an electrical outlet, again weather-related. Defendant issued payment to the plaintiffs consistent with this assessment.

On or about February 16, 2010 the Chamberlains again reported water damage and this time mold problems (Claim HBW933). Plaintiffs allege that defendant's adjustor, Jeffrey J. Donley, conducted a proper investigation. He engaged a forensic consulting firm to inspect the residence, resulting in the firm's determination that the water damage was not weather-related but was instead the result of condensation caused by the installation of insulation in the space above the ceiling. Based on the report that the damage was not caused by a leaking roof, defendant denied further benefits.

Plaintiffs allege that the condensation problem began in December 2006, and that mold has developed since that time. They allege that the Chamberlains have experienced respiratory problems due to the mold and have been advised by care providers that they must not live in the residence.

Plaintiffs assert two claims for relief. First, they claim that defendant broke its contractual duty to properly investigate claims UNK1714 and UKD1788. Second, they claim

that defendant breached the implied duty of good faith and fair dealing, thereby committing the tort of bad faith breach of insurance contract. They seek economic and non-economic damages arising from claimed personal injuries and increased repair costs. Defendant denies liability and asserts 17 affirmative defenses.

### [Defendant's] Motion for Partial Summary Judgment [#49]

The named insureds under the policy were Mr. and Mrs. Cary. They did not, however, reside there. Instead, they rented the property to the Chamberlains. Defendant contends that it was not aware that the Chamberlains lived there; that it did not name them as additional insureds; that they did not purchase a renters' policy; that the Chamberlains had no legally protected interest; and, therefore, that they have no standing to sue.

Plaintiffs respond that the policy defines the "insured" as "you and the following residents of your household: a. your relatives; b. any other person under the age of 21 who is in the care of any person named above." Rebecca Chamberlain is the daughter of Larry Cary and is, therefore, a "relative." Her husband is Mr. Cary's son-in-law, and the children are Mr. Cary's grandchildren. Plaintiffs further contend that they cared for the Chamberlain children during the period of time in question.

The plaintiffs also cite deposition testimony of adjustor Cole that he was aware that the Chamberlains were living in the residence at the time of the first claim and thereafter. He also testified that if the coverage was paid for, the insurer would not penalize the insured for an underwriting error. On those bases, plaintiffs claim that there was coverage for them as residents under the plain language of the policy; that defendant waived any claim that the Chamberlains were not residing in the residence and entitled to coverage; and that the Chamberlains were, at a minimum, intended third party beneficiaries of the insurance contract.

The definition of "insured," Ex. 49-2 at page 3 of 12 (page 1 of 21 in the original document), includes "relatives" and minor children for whom the named insureds provided care. By itself this language would seem to extend coverage to the Chamberlains. However, the coverage is for the "residence premises." *Id.* at 4 of 12. The "residence premises" is where "you" (meaning the named insured) reside. Putting the language together according to its plain meaning, I interpret it to mean that coverage extends to the named insureds if they reside in the residence and to any relatives, or minors for whom they provided care, or who were residing there with them. The case on which plaintiffs rely, *Iowa Nat. Mut. Ins. Co. v. Boatright,* 516 P.2d 439 (Colo. App. 1973) is not to the contrary. The named insured in that case did reside in the insured residence.

However, the Court finds that there are genuine issues of material fact regarding the parties' knowledge and intent that affect the waiver and third-party beneficiary argument and, therefore, that preclude summary judgment against the Chamberlains on the standing issue.

**[Defendant's] Motion to Exclude Testimony of Plaintiff's Expert Michael Macguire [#61].**

Plaintiffs' expert witness disclosures indicated that Mr. Macguire is a real estate expert who will "review depositions as they become available and other discovery as it is produced." The disclosure states that his report and CV are attached. The report apparently is the document submitted as Exhibit 61-1. It appears to consist of research information of the type that a real estate appraiser might consult in forming an opinion. However, no opinion of any kind is included.

The motion indicates that plaintiffs oppose it, but plaintiffs did not file a response. The "report," if that is what it is, and the disclosure fall far short of complying with Fed. R. Civ. P. 26(a)(2)(B). Therefore, the motion is granted.

**[Defendant's] Motion to Exclude Testimony of Plaintiff's Expert Terry Newberry [#62]**

Defendant moves to exclude the testimony of Mr. Newberry on the grounds that it does not meet the requirements of Fed. R. Evid. 702. The motion has been fully briefed. Neither party has requested an evidentiary hearing or oral argument. Without a request, the Court may consider the motion on the briefs. *See U.S. v. Nacchio,* 555 F.3d 1234, 1251 (10th Cir. 2009).

According to his CV, Ex. 62-1 at page 10 of 11, Mr. Newberry has a B.S. degree as a Safety Engineer. He lists experience as an OSHA trainer and at FEMA. He describes training and experience in a variety of areas apparently relating to hazardous and toxic substances. His work experience is described to include (1) four years as the regional manager for a corporation in Loveland, Colorado which purportedly implemented safety programs for large corporations, apparently including pollution prevention; and (2) 14 years as the "EH&S" (Environmental Health & Science?) director for a company in Fort Collins, Colorado where he apparently works on projects concerning physical and chemical hazards. It is difficult to fully assess his qualifications from the cryptic CV.

He was engaged in this case, apparently his second engagement as an expert witness, to do a mold study at the home in which the Chamberlains have resided. He used a Mold Armor Test Kit, described by plaintiffs in their response brief as a kit that is "readily available at any home repair center and is easily used by the public at large." He then, according to plaintiffs, will interpret the test kit results "in his expert capacity."

Mr. Newberry prepared a nine-page report that sets forth his expert opinions. Ex. 62-1. The report includes one and one half pages of discussion of his engagement, test results ("High" concentrations of mold in five sample areas), and recommendations (substantial interior and exterior demolition and re-construction work to attempt to remove all mold). The remainder of

5

the report consists of photographs and generic discussion of mold, testing methods, and related terminology.

In support of its motion, defendant provides the affidavit of Shawn Lopez. He indicates that he is the President of Orion Environmental, Inc., "a comprehensive engineering, environmental, safety and health consulting firm." Ex. 62-2. His CV is not provided, but he states that he has 20 years of experience and has performed numerous environmental investigations of various kinds, including for mold. He explains that the American Industrial Hygiene Association ("AIHA") and the American Conference of Governmental Industrial Hygienists ("ACGIH") "serve as authorities in the field of mold testing and sampling and dictate industry standards."

Mr. Lopez states that Mr. Newberry's report does not indicate that he used recognized sampling methodologies. He indicates that Mr. Newberry did not follow AIHA sampling strategy to determine airborne spore counts, failed to properly document sample locations and results, describe the type of petri dish he used, and therefore, engaged in unreliable testing that is unacceptable in the mold testing and sampling industry. He is critical of the testing techniques described by Mr. Newberry in his deposition and of his concept of a "high" spore count. Mr. Lopez describes what he considers to be professional and accurate testing (such as the Anderson Impact Sample method, which Mr. Newberry criticized in his report), as compared to Mr. Newberry's method, and he is critical of Mr. Newberry's failure to send his samples to a laboratory for analysis. He concludes that Mr. Newberry's methods were unreliable, not in compliance with scientific standards, subject to a wide disparity of error, and not in conformance with mold testing industry standards.

Expert opinion testimony is admissible if it is relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 594-95 (1993). The opinions are relevant if they would "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. They are reliable if (1) the expert is qualified "by knowledge, skill, experience, training, or education," (2) his opinions are "based upon sufficient facts or data," and (3) they are "the product of reliable principles and methods." *Ibid.*

The proponent of expert testimony has the burden to show that the testimony is admissible. *U.S. v. Nacchio,* 555 F. 3d at 1241. The trial court plays a "gatekeeping" role. This is not, however, a role that emphasizes exclusion of expert testimony. Judge Kane aptly summarized the thrust of *Daubert* in interpreting and applying Rule 702:

> A key but sometimes forgotten principle of Rule 702 and *Daubert* is that Rule 702, both before and after *Daubert,* was intended to relax traditional barriers to admission of expert opinion testimony. Accordingly, courts are in agreement that Rule 702 mandates a liberal standard for the admissibility of expert testimony. As the Advisory Committee to the 2000 amendments to Rule 702 noted with apparent approval, "[a] review of the caselaw after *Daubert* show that the rejection of expert testimony is the exception rather than the rule.

*Cook v. Rockwell Intern. Corp.,* 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (citations omitted).

How one tests for the presence of mold in a home, the results of such testing, and how best to remediate mold if it is present, are subjects that are beyond the typical knowledge and experience of a lay juror. The Court finds that Mr. Newberry's opinions are relevant, i.e., there is a logical relation between his opinions and the facts at issue in this case.

Mr. Newberry's qualifications are difficult to assess based solely on his report. The same can be said of Mr. Lopez' report. It appears likely that both gentlemen have had training and experience in mold detection and testing. Plaintiffs have not yet met the burden of establishing

Mr. Newberry's qualifications. This must be fleshed out further at trial before the Court can make a final determination.

Mr. Lopez' criticism focuses on Mr. Newberry's method of testing. Mr. Newberry used a mold test kit that apparently anyone can purchase at a store such as Home Depot. Neither Mr. Newberry nor Mr. Lopez discusses the kit, the degree to which it is a "recognized reliable method[ ] of gathering mold samples," (counsel's words, Response Br. at 4), the credentials of the company or individuals who created it, or the degree to which the kit is used by experts or others. Like Mr. Newberry's own qualifications, these are issues that will need more foundation at trial.

Mr. Lopez contends that airborne spore counts cannot be quantitatively measured without conducting a controlled sample test such as the Anderson Impact Sample method. Lopez Report at 4. Mr. Newberry argues that quantitative data, as opposed to qualitative analysis, must be interpreted "with great caution." Newberry Report at 8. He states that Anderson impaction samplers "are not well-suited for indoor building assessment." *Id.* at 6. Mr. Lopez states that AIHA and ADGIH "dictate industry standards." Lopez Report at 1. Mr. Newberry's report does not mention these standards, but, at least implicitly, he appears to be unimpressed by some of the methods commonly used by some "experts."

Essentially, these are two purported experts in the mold field who have different ideas of what methods of testing and analysis are reliable. The fact that an expert is critical of another person's methods does not necessarily render the second person's opinions inadmissible. Plaintiffs do not have to prove that Mr. Newberry's opinions are indisputably correct in order for them to be heard. *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1232 (10th Cir. 2004). The Court

finds nothing on the face of the two reports to suggest that either expert's method is necessarily more reliable than the other.

Also of interest is the deposition testimony of Karin Pacheco, M.D. who apparently treats Rebecca and Mark Chamberlain for asthma. Ex. 79-3 at 29, 36. The excerpts provided do not indicate precisely what Dr. Pacheco's credentials are in the mold field. However, she was asked questions about mold testing, and based upon her work with an industrial hygienist on her staff, she provided certain opinions. *Id.* at 31-36. Among other things she testified:

> Air sampling is the preferred method because it tells you what a person actually inhales. On the other hand, it's relatively expensive and insurance doesn't cover it. So sometimes doing swab samples is helpful to describe the kind of exposures in the home or to document that the area that is black and looks as though it has mold growth (sic) does indeed have mold growth.

*Id.* at 32.

This testimony from a physician who apparently was not retained by either party to provide testimony in this case tends to suggest that both air sampling (preferred by Mr. Lopez) and swab testing (preferred and used by Mr. Newberry) have value.

In its reply defendant makes a different argument. Because Mr. Newberry used a test kit that anyone can buy and use, then his testimony is "merely the opinion of a lay witness under the guise of an expert." Reply at 3. Defendant fears it will be unfairly prejudiced if the jury gives greater weight to the product of an ordinary test kit because of the endorsement of an "expert." However, this begs the question of whether Mr. Newberry is an expert who can provide amplification of the bona fides of the test kit and an explanation of the test results that extends beyond the ken of a typical lay user of the kit. For example, the kit suggests that if the mold growing indoors is much greater than an outdoor sample, "you may have a mold problem." Ex.

79-2 at 1. Someone with expertise in mold testing and analysis may well be able to expand on whether there in fact is a problem, what it is, and how it might be remediated.

The Court also takes into consideration that, according to Richard M. Hodges' report of July 1, 2011, Ex. 83-3, the presence of mold in the home was first noted by the defendant in 2004. *Id.* at 3. Defendant's adjustor who conducted the initial investigation of the 2010 claim found evidence of mold growth in the home. *Ibid.* Mr. Hodges states that a claims handler named Rebecca Michaud reported at that time that she intended to re-inspect the interior of the home and mold after water leakage stopped, but that there was no evidence that this was ever done. *Ibid.* It does not appear that there is a serious dispute about the presence of mold in the home or that it has been present to one degree or another at least dating back to 2004. The Court does not know whether Mr. Lopez has conducted an inspection of the home; or whether he denies the presence of mold; or even whether he believes that Mr. Newberry's conclusions regarding the extent of the mold or the necessity for remediation are wrong. All the Court has seen is that he has a professional disagreement with Mr. Newberry's testing procedure.

Based upon the information and argument provided, the Court finds that, subject to amplification of Mr. Newberry's qualifications and the reliability of the test kit, Mr. Newberry's opinions are sufficiently reliable to be heard by the jury. Mr. Lopez' criticisms go the weight to be given to the testimony but are not sufficient to render it inadmissible.

**Plaintiffs' Motion for Protective Order [#65]**

Plaintiff opposes a deposition of Larry Cary on grounds that the stress might cause health problems for him, and that a deposition will likely yield no new information. Defendant suggests that a proper foundation for preclusion of a deposition of a party has not been provided,

but that if he will not submit to a deposition, he should not be permitted to continue as a party. Plaintiff has not filed a reply.

Plaintiff submits a letter from David W. Albrecht, M.D., Mr. Cary's cardiologist, dated September 7, 2011. Dr. Albrecht states that he "would recommend that Mr. Cary be excused from his responsibilities in reference to a deposition. He suffers from intermittent atrial fibrillation and has difficulty handling stress. Stress is definitely causative in his atrial fibrillation and whether or not it recurs."

Dr. Albrecht's opinion is entitled to deference from this Court. Moreover, the Court would certainly not wish for a deposition to cause health problems for any witness. If defense counsel does not have a specific need that he believes has not been satisfied by his depositions of the other plaintiffs, I would expect him voluntarily to forego such a deposition. Certainly this may not be used as a litigation tactic.

On the other hand, the letter does not indicate what information was provided to the doctor regarding the proposed deposition, such as its location, length, number of persons who will be present, etc. It does not indicate whether the doctor would find a deposition to be unduly stressful if its parameters were known, nor does it indicate whether atrial fibrillation is likely to result. Mr. Cary is the lead named plaintiff in the case. There has been no indication that he wishes to be excused from that role or even that there are no plans for him to testify at trial.

The letter is now more than three months old. The Court does not know what developments in Mr. Cary's condition, if any, have occurred since the letter was written. Aside from that, the letter does not provide sufficient information to warrant an order precluding a carefully limited deposition of a party. Therefore, subject to the receipt of more information from the doctor, the Court denies the motion.

However, if defense counsel persists in its demand for the deposition, the Court orders that the deposition must be scheduled on a date and at a place of the plaintiffs' choosing (including in the doctor's office suite if the doctor authorizes it).  Defendant's examination will not exceed one hour.  The examination will be conducted courteously and in a low-key, non-argumentative manner.  If plaintiffs' counsel believes that the deposition is not being conducted in that manner, he may suspend the deposition and seek guidance from the Court.  The deposition will be videotaped so that the Court can consider the conduct of all counsel and Mr. Cary if necessary.  At the first sign of any type of medical concern, the deposition will be immediately terminated.

If either party wishes to present further evidence on this subject before the deposition, or if any other issues need to be heard before or during the deposition, counsel should contact the Court by telephone (303-844-4694) so that the matter may be immediately heard and resolved.

**[Defendant's] Motion for Partial Summary Judgment on Issue of Future Damages [#71]**

Defendants assume for purposes of this motion that the mold problems at the home will be remediated.  They argue that plaintiffs have provided no evidence indicating that the Chamberlains are nevertheless likely to suffer asthma symptoms and related damages in the future that were caused by their past exposure to mold in the home.  Defendant cites deposition testimony from Mark and Rebecca Chamberlain to the effect that no one knows what the future medical issues or the dollar costs associated with them might be and adds that plaintiffs have endorsed no experts on these subjects.  Plaintiffs have not responded.

The Court finds that plaintiffs have effectively confessed the motion.  They have not met their burden of showing the existence of a genuine issue of material fact concerning monetary damages that might be sustained as a result of future medical issues.  The motion is granted.

### [Defendant's] Motion for Summary Judgment [#73]

Defendant argues that (1) there is no evidence that an engineer would have discovered anything different than Mr. Cole found in 2006 and 2008, and (2) its coverage determination was correct.

In its Second Amended Complaint plaintiffs allege that the terms and conditions of their insurance policy require the defendant "to properly investigate all claims made on the Residence." ¶34. In response defendant states that this is an allegation of law, as to which no response is required, but to the extent an answer is required, the allegation is denied. Answer to Second Amended Complaint ¶34. I agree that it is a matter of law. The Court concludes that the duty to conduct a reasonable investigation based upon all available information is, at a minimum, implicit in the insurance contract. The Court also concludes that such a duty exists as a matter of law. *Cf.* C.R.S. § 10-3-1104(1)(h)(IV) (refusing to pay a claim without conducting a reasonable investigation based upon all available information is an "unfair claim settlement practice").

As indicated above, a claims inspector for the defendant discovered mold in the home in 2004. A claims adjuster for the defendant found mold in the home in 2010. There is no indication that mold remediation was conducted between 2004 and 2010. It can reasonably be inferred that mold was present in 2006 and 2008.

Plaintiffs have evidence that the minor children began to exhibit signs of asthma in 2005. Affidavit of Rebecca Chamberlain ¶7. They have evidence linking asthma symptoms to mold contamination. *See* Ex. 79-3, Pacheco depo. at 13-14. This evidence also raises a fact question about the existence and extent of the mold problem in 2006 and 2008.

The reports of Mr. Newberry and Mr. Lopez suggest that, although there are different methods of testing for mold, it is not usually difficult to do it. Mr. Newberry apparently believes

that a relatively simple testing kit of the kind that is readily available at a home improvement store can do it. The insurance adjuster was able to determine in 2010 that mold was present and that a more complete forensic engineering inspection was required. Those inspections have led to a purported mold expert's investigation and determination that a serious and dangerous mold problem exists in this home.

In light of those facts, the Court finds that whether a reasonable engineering inspection in 2006 or 2008 based upon all available information would have confirmed the presence of mold and its extent is a fact determination that is inappropriate for summary disposition.

Defendant's second argument, that it appropriately denied the 2010 claim, misses the point of plaintiffs' claims in this case. They are not contending that coverage was available in 2010. Their expert acknowledges that if an inspection in 2006 and 2008 had produced evidence of non-weather related mold contamination, coverage might not have been available then either. Hodges Report at 7.

I do agree, however, that plaintiffs have not shown that there is a genuine issue of material fact concerning their bad faith claim. "To recover for bad faith breach of an insurance contract, one must prove that the insurer's conduct, viewed objectively in light of standards of conduct in the industry, was unreasonable and that the insurer either knew that its conduct was unreasonable or recklessly disregarded the fact that its conduct was unreasonable." *See, e.g., Martin v. Principal Cas. Ins. Co.,* 835 P.2d 505, 510 (Colo. App. 1991).

Plaintiffs' contention is that Mr. Cole did not conduct a reasonable investigation. Plaintiffs have offered no evidence that suggests either than Mr. Cole or anyone else associated with the defendant knew in 2006 or 2008 that Mr. Cole's investigation was unreasonable. Plaintiffs offer no evidence of recklessness either except for one sentence in the Hodges report:

14

"Such unreasonable conduct (the lack of a reasonable and thorough investigation) certainly represents a reckless disregard for whether or not such failure to appropriately investigate was reasonable." Hodges Report at 7.

An insurer recklessly disregards the unreasonableness of its conduct if it acts "with knowledge of facts that indicate that its (conduct)(position) lacks a reasonable basis or when it is deliberately indifferent to information concerning the claim." Colorado Jury Instructions – Civil 25:7 (2011 ed.) (citing *Travelers v. Savio,* 706 P.2d 1258 (Colo. 1985)). Based upon Mr. Cole's investigations in 2006 and 2008, plaintiff's insurance claims were paid. As indicated above, a more adequate investigation might have appropriately resulted in denial of coverage. Plaintiffs' response brief on the bad faith issue simply reiterates its position on breach of contract. Response Br. at 3-5. It does not discuss, or cite any evidence, that suggests either knowledge that Mr. Cole did not conduct a reasonable investigation or reckless disregard for whether his investigation was reasonable. Mr. Hodges likewise does not provide any factual support for his opinion that the defendant recklessly disregarded whether Mr. Cole's investigation was reasonable.

Essentially, plaintiffs argue that Mr. Cole's investigation was negligent, i.e., below the standard of care (in contrast to the 2010 investigation). However, more than negligence is required to prove a bad faith claim. *Travelers Ins. Co. v. Savio,* 706 P.2d at 1274.

Accordingly, the Court grants the motion for summary judgment and dismisses the Second Claim for Relief. The Court denies the motion with respect to the First Claim for Relief.

**Order**

1. Defendant's motion #49 is denied.
2. Defendant's motion #61 is granted.

3. Defendant's motion #62 is denied.

4. Plaintiff's motion #65 is denied.

5. Defendant's motion #71 is granted.

6. Defendant's motion #73 is granted in part and denied in part.

DATED this 12th day of December, 2011.

BY THE COURT:

*Brooke Jackson*

_____

R. Brooke Jackson
United States District Judge